Opinion issued August 1, 2023



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-22-00022-CR

————————————

**ALEXIS LIMON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 230th District Court
Harris County, Texas
Trial Court Case No. 1627432

## MEMORANDUM OPINION

Alexis Limon appeals his conviction for aggravated robbery. *See* TEX. PENAL CODE § 29.03. Limon pleaded not true to an enhancement and proceeded to a jury trial. A jury found him guilty, found the enhancement true, and assessed Limon's punishment at 40 years' imprisonment and a $5,000 fine.

On appeal, he argues the evidence was insufficient to support his conviction, the evidence was insufficient to support the enhancement paragraph, and he received ineffective assistance of counsel during the punishment hearing. We affirm.

## Background

Limon was charged with aggravated robbery. He pleaded not guilty and proceeded to a jury trial.

### A. Guilt/Innocence Testimony

At trial, Irineo Monjarez, Jr. ("Irineo Jr.") testified that in April 2019, he saw a white Silverado truck next to his father's truck outside their house. It was about one in the morning, and several streetlights were on. The dome light on his father's truck was also on. Irineo Jr. saw a person inside of his father's truck on the driver's side. Irineo Jr. confronted the person in the truck, and a struggle ensued. The person got into the running Silverado. Irineo Jr. held onto him, and the truck crashed into a ditch. Irineo Jr. blacked out and suffered damaged discs in his back from the crash. When he regained consciousness, he realized his neighbor and friend, Jose Andres Almazan, had come outside. Almazan and Irineo Jr. continued to fight with the man. The man pulled out a gun and shot Almazan in the ankle. Irineo Jr.'s brother ran out and grabbed the gun, unloaded it, and pointed it at the unknown man. Irineo Jr. called 911, but the man ran away on foot before first

responders arrived. Irineo Jr. provided a description to the responding law enforcement officers.

Irineo Jr. testified that he asked around the neighborhood to investigate who the robber could have been. That same day, he heard it could have been Alexis Limon, so he looked Limon up on Facebook. He forwarded a photograph of Limon to detectives. He also identified Limon in a photo array. Irineo Jr. also identified Limon in court.

Jose Andres Almazan testified that shortly after midnight he heard a crash, looked out a window, and saw two people fighting in the street. When he saw it was his friend, Irineo Jr., he went to assist. He attempted to put the man fighting with Irineo Jr. in a chokehold. The man pulled a gun from his waistband and shot two or three times. Almazan was shot in the ankle. He was treated at the hospital, where he spoke to a detective. He identified Limon in a photo array, stating that he was 90% sure Limon was the person who had shot him. Later, Irineo Jr. showed him a photograph from the internet of a possible suspect. Almazan then told law enforcement that he was 100% sure of his identification from the photo array. Almazan identified Limon in court.

The Houston Police Officer who responded to the scene testified that he arrived when Almazan was being treated by paramedics in an ambulance. He secured the scene until a detective from the robbery division arrived. He noticed

that Irineo Monjarez, Sr.'s ("Irineo Sr.") truck had damage consistent with popping out the lock and prying the door open, and the radio had been removed. There was also a screwdriver or prying tool in the truck. The stereo from Irineo Sr.'s truck was found in the Silverado.

The police officer collected the firearm, ammunition, a jacket, and a cell phone. The phone was found in the Silverado and believed to belong to the suspect. The jacket was found in a ravine about thirty feet away, in the direction that the suspect had fled. Inside the jacket, the officer found a live round and a fired bullet casing. The officer testified that similar ammunition was recovered from the firearm.

The robbery division detective who responded to the scene testified at trial. He learned that the Silverado truck had been reported stolen. The owner lived a few blocks away from the scene of the robbery. The detective had a patrol officer pick up the owner of the Silverado and bring him to the scene to identify his truck. The Silverado was then towed to a processing facility.

The detective also talked to Almazan at the hospital. Almazan described the suspect as about 5'6" tall, 140 to 150 pounds, with tattoos covering his face and neck. The detective testified that he received an email later in the day from Almazan with a photo of a person he believed had shot him. Once he found the suspect's name, the detective searched and realized that the suspect, Alexis Limon,

4

lived next door to the owner of the Silverado truck. The detective created a photo array with Limon and five similar looking individuals. He gave the array to another detective who was unaware which of the individuals in the array was the suspect. That detective presented the array to Irineo Jr. and Almazan, who both identified Limon as the suspect.

The jury found Limon guilty and proceeded to a punishment hearing.

## B.     Punishment Testimony

Limon pleaded not true to the enhancement paragraph alleging a prior felony conviction for evading arrest in a motor vehicle in 2015. The State then presented punishment evidence. In addition to evidence to link Limon to the prior conviction alleged in the enhancement paragraph and evidence of Limon's prior criminal history, the State presented evidence of unadjudicated extraneous offenses allegedly committed by Limon after the aggravated robbery. The State also presented evidence regarding Limon's gang affiliation. Limon's mother was a mitigation witness.

### 1.     Adjudicated Extraneous Offenses

The State presented evidence of offenses committed by Limon before the aggravated robbery. This evidence included numerous judgments of conviction or orders for deferred adjudication. The State used one of the prior judgments to support the enhancement paragraph alleged in the indictment. The State alleged

5

that in 2015 Limon was convicted of evading arrest in a motor vehicle and was sentenced to three years' imprisonment. Limon pleaded "not true" to this enhancement paragraph.

The State called the supervisor of the latent print section of the Houston Forensic Science Center regarding the fingerprints on the judgments. She testified that she took fingerprints of Limon and compared them to fingerprints on the prior judgments. All the judgments contained Limon's name and state identification number. The fingerprint examiner was able to match most of them by fingerprint as well. The fingerprint on three of the judgments was either inconclusive or did not have a "print of value." One of the inconclusive judgments was the judgment underlying the enhancement paragraph. The fingerprint examiner testified that while she could not conclusively match Limon to three judgments, she could not conclude that the fingerprints on them did not belong to Limon either.

### 2. Limon's Gang Affiliation

A Houston Police Sergeant with the gang division testified that Limon was placed in a database for tracking gang members because he was a self-admitted member of Houstone Tango Blast. He also had gang-related tattoos.

### 3. Unadjudicated offenses

The State presented evidence of several unadjudicated offenses allegedly committed by Limon. Each of these offenses occurred either right before the aggravated robbery or in the years after it but before Limon's trial.

#### (1) Felon in possession of a firearm

Harris County Deputy P. Manickas testified that in March 2019 he responded to a call that a man in all-black clothing, possibly holding a gun, was walking around vehicles in a residential driveway. When he arrived on the scene, the deputy viewed the caller's surveillance video. The deputy testified that the suspect could be seen pulling on car handles, consistent with burglarizing vehicles and theft. The deputy used his radio to relay a description of the suspect. When an officer responded that a suspect matching the description was at a nearby gas station, the deputy went to that location. He observed the same person he had seen in the surveillance video, who he later identified as Alexis Limon.

Another officer testified that he heard the radio description and then saw someone, later identified as Limon, standing in a grassy area near the air pump in a nearby gas station. As the officer approached, Limon started to run away. The officer detained Limon, then walked over to the grassy area where he had been standing. The officer found a firearm. Though the officer did not see Limon drop the firearm, the officer testified that he knew it had not been there long because it

7

was not covered in condensation. The officer testified that Limon had a Houston Astros star tattooed on his neck and that the officer knew this to be gang related. Limon was arrested for felon in possession of a firearm. A ballistics examiner tested the firearm and determined it was operational.

**(2) Evading in a motor vehicle, failure to stop and render aid, unauthorized use of a motor vehicle, and burglary of a motor vehicle**

A patrol officer testified that he was in a residential area when he saw parked taillights in the middle of the street in July 2019. He pulled up to the vehicle and saw that the driver's side door was open, but nobody was inside. Limon was in a parked car next to it. The officer believed that Limon was either trying to steal or burglarize the car. As the officer and his partner approached, Limon disobeyed their commands, got into the running vehicle in the middle of the roadway, and drove away. A chase ensued. Limon's vehicle was hit when he ran a redlight. He did not stop. Eventually, he got out of the car and fled on foot. The officer's partner apprehended Limon in a driveway. The officers learned that the car Limon had been driving was stolen. The stereo had been pulled out, and the ignition in the parked car had been damaged.

The patrol officer testified that the driver of the vehicle that hit Limon's as he was fleeing sustained injuries and went to the hospital. Limon was charged with

four felony cases: evading in a motor vehicle, failure to stop and render aid, unauthorized use of a motor vehicle, and burglary of a motor vehicle.

### (3) Evading on foot and failure to identify as a fugitive

In December 2020, an officer initiated a traffic stop when he saw a car driving the wrong way down the road. The car stopped temporarily and then drove away. A chase ensued. The car turned and crashed into a utility area. The driver and another suspect fled on foot. The officer pursued the suspect through a trailer park and eventually apprehended him. Meanwhile, the officer radioed a description of the other suspect, including that the suspect was wearing a black coat and black pants. After an extensive search, Limon was apprehended under an outdoor pool table when the homeowner flagged law enforcement down. Limon had discarded his shirt, pants, and shoes. The officer saw the clothes nearby on a fence.

Limon told law enforcement that he was riding his dirt bike and passing through to get to his residence. He gave law enforcement a false name and date of birth. Law enforcement used Limon's fingerprints to identify him and determine that he had six open felony warrants. The officer testified that Limon was charged with felony evading on foot and could have been charged with the misdemeanor offense of failure to identify as a fugitive.

**(4) Possession of controlled substances and public intoxication**

An officer testified that he was dispatched to an apartment complex regarding an intoxicated man who had broken a car window in April 2021. Law enforcement split up to locate the suspect. From across the courtyard, the officer saw Limon. The officer watched as Limon started running when he saw the other officers. The officer chased and detained Limon.

The officer determined that Limon was not the suspect described in the call about the broken window, but he believed that Limon was intoxicated. Limon had watery eyes, droopy eyelids, and slow, slurred speech. He was confused and had difficulty following basic instructions. The officer arrested Limon for public intoxication.

The officer searched Limon and found ecstasy, cocaine, Adderall, and marijuana. A forensic chemist tested the ecstasy tablets and found that they contained methamphetamine and eutylone. Limon was charged with felony possession of a controlled substance for the ecstasy.

**(5) Unauthorized use of a motor vehicle and felon in possession of a firearm**

An officer testified that he initiated a traffic stop on a stolen GMC Yukon in May 2021. During the stop, the officer observed the driver making furtive movements towards the back seat. The officer identified Limon as the driver. The

owner of the vehicle confirmed that Limon did not have permission to drive the Yukon.

A search of the Yukon revealed a firearm on the back right passenger floorboard. A ballistics examiner tested the firearm and confirmed it was operational. Limon was charged with unauthorized use of a motor vehicle.

### (6) Aggravated assault with a deadly weapon

An investigator with the Harris County Sherriff's Office testified that she investigated an assault on two inmates in the Harris County jail that occurred in September 2021. The investigator viewed surveillance video from the time of the assault. She described the video, and it was shown to the jury. The assault occurred in the evening when lights were off in the cell block. Inmates propped sheets, towels, and blankets to attempt to block the camera's view shortly before the assault. The investigator testified that this typically happens when an assault, sexual intercourse, gambling, or dice games are happening. Next, several inmates went into the cell block. Their feet are visible moving around while a broomstick is being tossed. The blankets attempting to cover the camera flare as the assault is happening. People's hands with closed fists can be seen as one complainant is pulled from the top bunk. Another person can be seen side-punched. The lights turn on in the cell block, and all the inmates run out except for one complainant.

Limon was later identified in the video and can be seen throwing a gang sign as he left the cell block.

The investigator testified that she reviewed a roster of the men in the cell block on that date and time and obtained intake photos of each of them. She then used a snipping tool to take screenshots from the video of each inmate as he leftthe cell block after the assault. She compared the intake photos to the screenshots and identified six inmates who were part of the assault. One of the individuals the investigator identified was Limon. The investigator created a photo array that was shown to one complainant. The investigator explained that she later interviewed Limon and charged him, and four other people, with aggravated assault with a deadly weapon.

### 4.    Mitigation testimony

Appellant's mother testified that he began using drugs around age 15 and that he dropped out of school in the ninth grade. She tried to parent him to not use drugs, but drugs had changed him. She testified that his family supported him and that he is a better person when not using drugs.

* * *

The jury found the enhancement paragraph true and recommended a 40-year sentence and $5,000 fine. The court sentenced Limon accordingly.

12

## Sufficiency of the Evidence

Limon first challenges the sufficiency of the evidence to support his aggravated robbery conviction.

### A. Standard of Review

Every criminal conviction must be supported by legally sufficient evidence as to each element of the offense that the State is required to prove beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316 (1979); *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011). In a legal sufficiency review, we consider all the evidence in the light most favorable to the verdict, and we decide whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Brooks v. State*, 323 S.W.3d 893, 902 (Tex. Crim. App. 2010).

The evidence may be circumstantial or direct, and juries may draw multiple reasonable inferences from the evidence presented at trial. *Hooper v. State*, 214 S.W.3d 9, 14–15 (Tex. Crim. App. 2007). The jury is the sole judge of witness credibility and of the weight given to any evidence presented. *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). A jury may believe or disbelieve some or all a witness's testimony. *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. 1981). We presume that the jury resolved any conflicting inferences in favor of the verdict, and we defer to that determination. *Merritt*, 368 S.W.3d at 525–26.

**B.      Aggravated Robbery**

Limon does not argue that the evidence is inadequate to demonstrate that the crime of aggravated robbery was committed. Instead, he contends there is insufficient evidence identifying him as the perpetrator.

"A person commits [robbery] if, in the course of committing theft . . . and with intent to obtain or maintain control of the property, he . . . intentionally or knowingly threatens or places another in fear of imminent bodily injury or death." TEX. PENAL CODE § 29.02(a)(2). "A person commits [aggravated robbery] if he commits robbery . . . and he . . . uses or exhibits a deadly weapon . . . ." *Id.* § 29.03(a)(2).

A conviction for aggravated robbery may be based on the testimony of a single eyewitness. *Smith v. State*, 421 S.W.3d 161, 164 (Tex. App.—San Antonio 2013, no pet.) (citing *Johnson v. State*, 176 S.W.3d 74, 77–78 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd); *see also Sosa v. State*, 177 S.W.3d 227, 230 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (holding evidence legally sufficient where witness identified defendant based on build, clothing, and height). Additionally, "circumstantial evidence alone can be sufficient to establish guilt." *Hooper*, 214 S.W.3d at 13.

"Identity may be proven by direct evidence, circumstantial evidence, or by reasonable inferences from the evidence." *Ingerson v. State*, 559 S.W.3d 501, 509

(Tex. Crim. App. 2018) (citing *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009)). Proof by circumstantial evidence is equally as probative as proof by direct evidence. *See McGee v. State*, 774 S.W.2d 229, 238 (Tex. Crim. App. 1989). "[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *Whatley v. State*, 445 S.W.3d 159, 166 (Tex. Crim. App. 2014) (alteration in original) (quotation omitted). "[I]dentity may be proven by inferences." *Roberson v. State*, 16 S.W.3d 156, 167 (Tex. App.—Austin 2000, pet. ref'd); *see also Greene v. State*, 124 S.W.3d 789, 792 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) ("Identity of a perpetrator can be proved by direct or circumstantial evidence; eyewitness identification is not necessary."). In reviewing historical facts that support conflicting inferences, we must presume that the jury resolved any such conflicts in the State's favor, and we must defer to that resolution. *Whatley*, 445 S.W.3d at 166. When identity is at issue, we must consider the combined and cumulative force of all evidence. *See Merritt*, 368 S.W.3d at 526.

**C.    Analysis**

Considering the combined and cumulative force of all the evidence, we conclude that there is sufficient evidence to prove Limon's identity as the perpetrator.

The evidence shows that Irineo Jr. saw a man get into his father's truck, which was parked outside their house, in the middle of the night. The truck's dome light turned on. Irineo confronted the man and fought with him for several minutes. He testified that three streetlights were on. The fight continued when the man got into his own truck. The truck crashed into a ditch. Almazan heard the struggle and came outside to join the fight. Irineo Jr. saw the man pull out a gun from his waistband and shoot Almazan in the ankle. Irineo Jr. called 911 and the man fled the scene. Irineo Jr. described the suspect as a Hispanic male, with multiple tattoos on his face and neck, and maybe 140 to 150 pounds.

The detective also spoke with Almazan in the hospital who described the suspect as "5'6", 140, 150" and described that his face and neck were covered in tattoos. Almazan testified at trial that he saw a "full frontal face view" of Limon while engaged in the fight. He testified that he would not forget the face of the person who shot him.

Irineo Jr. testified that after the incident he found a photograph on Facebook that he believed to be the suspect. He sent the photograph to the lead detective. The detective created a photo array, containing a different photograph of Limon as well as five other individuals with similar characteristics. Irineo Jr. identified Limon in the array. Almazan also identified Limon, stating he was 90% sure of his identification. Both men also positively identified Limon in court. At trial, Irineo

16

Jr. testified that he had shown the Facebook photograph of Limon to Almazan before Almazan viewed a photo array. Almazan testified that Irineo Jr. showed him the Facebook photograph after he had identified Limon in the photo array.

Limon contends the evidence is insufficient to support the conviction in this case because the eyewitnesses' identifications from a photo lineup were unreliable. He argues that the eyewitnesses had seen a Facebook photograph of Limon before they saw the array, and they had already decided that he was the perpetrator. He also argues that two of the five photographs in the arrays were of individuals who had large face tattoos that were dramatically different than Limon's. Finally, he argues that there is no physical evidence connecting him to the crime.

Here, the jury had the opportunity to assess Irineo Jr.'s and Almazan's credibility and to make reasonable inferences from their testimony. The jury also had the opportunity to view the photo arrays that were shown to both men. Though Irineo Jr. and Almazan testified differently about whether Almazan saw the Facebook photo before he identified Limon in an array or after, it is the jury's function to resolve any conflicts in the evidence. *See Merritt*, 368 S.W.3d at 525–26. The jury was likewise entitled to decide whether the identifications of appellant from the photo array were reliable. Considering all the evidence in the light most favorable to the verdict, we conclude that the jury was rationally justified in finding guilt beyond a reasonable doubt and that the evidence is sufficient to

17

support Limon's conviction for aggravated robbery. *See Brooks*, 323 S.W.3d at 895, 899.

We overrule Limon's first issue.

**Sufficiency of the Evidence to Support Enhancement Paragraph**

Limon next argues that the evidence is legally insufficient to link him to the prior felony offense used to enhance his punishment. In the indictment, the State alleged one enhancement paragraph. This paragraph alleged that in 2015, Limon was convicted of evading arrest and detention in a motor vehicle. On appeal, Limon argues that the State did not offer sufficient evidence of identity. Specifically, Limon argues that the State did not prove the prior conviction beyond a reasonable doubt because the fingerprint examiner could not match the fingerprint on the 2015 judgment to him. He also contends that the State did not provide additional identity evidence nor did the State cross-examine his mother, who testified at punishment, regarding his criminal history. We disagree and hold that the evidence was sufficient for the jury to find the enhancement true.

**A.     Standard of Review**

To establish that the defendant has been convicted of a prior offense, the State must prove beyond a reasonable doubt that (1) a prior conviction exists, and (2) the defendant is linked to that conviction. *Flowers v. State*, 220 S.W.3d 919, 921 (Tex. Crim. App. 2007). There is no specific document or mode of proof

18

required to prove either that a prior conviction exists or that the defendant is linked to that conviction. *Id.* The Court of Criminal Appeals has stated:

> There is no "best evidence" rule in Texas that requires that the fact of a prior conviction be proven with any document, much less any specific document. While evidence of a certified copy of a final judgment and sentence may be a preferred and convenient means, the State may prove both of these elements in a number of different ways, including . . . documentary proof (such as a judgment) that contains sufficient information to establish both the existence of a prior conviction and the defendant's identity as the person convicted.

*Id.* at 921–22. "Any type of evidence, documentary or testimonial, might suffice" to prove a conviction. *Id.* at 922. The factfinder looks at the totality of evidence admitted concerning the prior conviction to determine (1) whether there was a prior conviction, and (2) whether the defendant was the person convicted. *Id.* at 923; *see Henry v. State*, 509 S.W.3d 915, 919 (Tex. Crim. App. 2016) (stating that factfinder "must look at the totality of the evidence adduced" and "must consider the evidence as a whole, as each piece of evidence may provide little meaning if considered in isolation").

**B.     Testimony and evidence**

The supervisor of the latent print section of the Houston Forensic Science Center testified during punishment. She testified that she took a record of all ten of Limon's fingerprints. She identified him in court as the same person who provided the prints. She also testified that she reviewed the State's exhibits 91 through 99, which were prior orders for deferred adjudication or judgments of conviction. She

told the jury of her findings regarding whether the fingerprints on these exhibits matched the ones she took from Limon. Several of the exhibits contained Limon's name, state identification number, and a fingerprint match.

The supervisor testified that "no print of value" was found on two of the exhibits: State's exhibit 96 and 97. State's exhibit 96 was a judgment of conviction for evading arrest and detention with a vehicle. This is the conviction the State alleged in the enhancement paragraph. The trial court judgment states that the offense was committed on January 13, 2015 and that on January 15, 2015, the defendant was sentenced to three years in jail. State's exhibit 97 was a judgment of conviction for burglary of a motor vehicle. The offense was committed on the same date as exhibit 96, January 13, 2015. The sentencing date was February 5, 2015, and the defendant was sentenced to 46 days in jail, with 23 days credit. State's exhibits 96 and 97 both contained Limon's name and state identification number.

The supervisor testified that "no print of value" meant that there was no ridge detail to compare between the prints she had taken and the thumbprint on the prior judgments.

C.    Analysis

Considering the totality of the evidence, there was sufficient evidence to prove beyond a reasonable doubt that Limon committed evading arrest in a motor

vehicle. *See Flowers*, 220 S.W.3d at 921. In proving prior convictions, identity often includes a combination of identifiers, with each case judged on its own merits. *Henry v. State*, 466 S.W.3d 294, 301 (Tex. App.—Texarkana 2015), *aff'd*, 509 S.W.3d 915 (Tex. Crim. App. 2016) (quoting *Littles v. State*, 726 S.W.2d 26, 30–32 (Tex. Crim. App. 1984) (op. on reh'g)). "[T]he proof that is adduced to establish that the defendant on trial is one and the same person that is named in an alleged prior criminal conviction or convictions closely resembles a jigsaw puzzle." *Flowers*, 220 S.W.3d at 923 (quotation omitted).

The evidence at trial established Limon's birthdate and state identification number. The record established that Exhibits 92–99, which were either orders for deferred adjudication or judgments of conviction, each contained Limon's name and state identification number. "No print of value" was found on exhibit 96, the judgment for evading arrest with a motor vehicle, but Limon's name and state identification number were on the document. The Houston Forensic Science Center supervisor testified that "no print of value" meant that there were no ridge details on the fingerprint on the judgment to compare to the ten-print card she had taken from Limon. She did not testify that her conclusion excluded Limon as the person whose fingerprint appeared on the judgment. The dates of the offense and judgment, January 13, 2015 and January 15, 2015, also fall chronologically within

the criminal history established by the orders for deferred adjudication and judgments that did contain Limon's fingerprints.

A judgment with the defendant's name and state identification number is sufficient for the jury to determine beyond a reasonable doubt that the offense in question was committed, and that Limon committed it. *See Flowers*, 220 S.W.3d at 923; *see also Barnes v. State*, 585 S.W.3d 643, 650 (Tex. App.—Texarkana 2019), (holding sufficient a prior conviction linked by name and state identification number considering the surrounding judgments and identifying information also admitted), *rev'd on other grounds*, PD-1072-19, 2021 WL 476483 (Tex. Crim. App. Feb. 10, 2021) (not designated for publication).

We overrule Limon's issue related to the sufficiency of the evidence to prove his prior conviction that enhanced his sentence.

**Ineffective Assistance of Counsel During Punishment Hearing**

In his third issue, Limon contends that he received ineffective assistance of counsel during the punishment phase of trial. Each of his ineffective assistance of counsel complaints relates to either (1) the evidence supporting additional criminal offenses that the State alleged Limon committed between the underlying aggravated robbery and trial, or (2) the evidence to support prior adjudicated offenses committed by Limon. Limon has not met his burden to establish that he received ineffective assistance of counsel during the punishment hearing.

22

## A. Standard of Review

The Sixth Amendment to the United States Constitution and the Texas Constitution guarantee a criminal defendant the right to reasonably effective assistance of counsel. U.S. CONST. amend. VI; TEX. CONST. art. I, § 10; *see Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). The right to effective assistance of counsel requires objectively reasonable representation, not errorless performance. *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 686 (1984), and *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006)).

To establish that trial counsel provided ineffective assistance, an appellant bears the burden to demonstrate by a preponderance of the evidence that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687; *Lopez*, 343 S.W.3d at 142. An appellant must establish both prongs before an appellate court will find counsel's representation to be ineffective. *Lopez*, 343 S.W.3d at 142 (citing *Strickland*, 466 U.S. at 687); *see Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009) ("An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong.").

To satisfy the first prong, an appellant must show that his trial counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms. *Strickland*, 466 U.S. at 687–88; *Lopez*, 343 S.W.3d

23

at 142. Under the second prong, an appellant must demonstrate prejudice or "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see Lopez*, 343 S.W.3d at 142. A reasonable probability is one sufficient to undermine confidence in the outcome. *Lopez*, 343 S.W.3d at 142.

For an appellate court to find that counsel was ineffective, "counsel's deficiency must be affirmatively demonstrated in the trial record; the court must not engage in retrospective speculation." *Id*. "It is not sufficient that appellant show, with the benefit of hindsight, that his counsel's actions or omissions during trial were merely of questionable competence." *Id.* at 142–43. (quoting *Mata v. State*, 226 S.W.3d 425, 430 (Tex. Crim. App. 2007)). Furthermore, a claim of ineffective assistance of counsel also requires proof of prejudice. *Bone v. State*, 77 S.W.3d 828, 836–37 (Tex. Crim. App. 2002).

In most cases, the record on direct appeal is undeveloped and thus inadequate to prove a claim of ineffective assistance.[1] *See Menefield v. State*, 363 S.W.3d 591, 592–93 (Tex. Crim. App. 2012); *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) ("A substantial risk of failure accompanies an appellant's claim of ineffective assistance of counsel on direct appeal."). The Court

---

[1]     Claims of ineffective assistance of counsel rejected on direct appeal "due to lack of adequate information may be reconsidered on an application for a writ of habeas corpus." *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011).

24

of Criminal Appeals has repeatedly stated that trial counsel "should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Menefield*, 363 S.W.3d at 593 (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)). When trial counsel is not provided an opportunity to explain his actions, we will not find that counsel's performance was deficient unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Id.* (quoting *Goodspeed*, 187 S.W.3d at 392).

**B.    Analysis**

**1.    Counsel was not ineffective for failing to secure a preliminary ruling on judgments that did not contain an identifiable fingerprint match.**

Limon argues that his counsel was ineffective for failing to secure a preliminary hearing on the State's fingerprint evidence used to link Limon to prior judgments of conviction. Specifically, he argues that the State could not prove beyond a reasonable doubt that he committed the crimes listed in three judgments, State's exhibits 96, 97, and 99. Exhibit 96 was a judgment for evading arrest in a motor vehicle. This is the prior felony conviction that the State alleged should enhance Limon's sentence.

During punishment, the State produced several prior judgments as State's exhibits 92–99, which were either orders for deferred adjudication or judgments of conviction. Each exhibit contained Limon's name and state identification number.

Several of the exhibits also contained a fingerprint match. A fingerprint expert was unable to identify the fingerprint on three of the judgments, exhibits 96, 97, and 99. She testified that her inability to identify the fingerprint on these three judgments did not mean that the fingerprint could not belong to Limon.

The judgments without identifiable fingerprints fit chronologically among the judgments identified with Limon's fingerprint. Considering the totality of the evidence presented regarding Limon's criminal history, the factfinder could reasonably decide beyond a reasonable doubt that Limon committed the offenses listed in the judgments. *See Flowers*, 220 S.W.3d at 923. Counsel was not ineffective for failing to secure a preliminary ruling on the admissibility of the judgments because the trial court would not have abused its discretion in admitting the evidence. Limon has failed to meet his burden to prove that his counsel's performance fell below an objective standard of reasonableness. *See Lopez*, 343 S.W.3d at 142.

### 2. Counsel was not ineffective for failing to ask for a preliminary ruling on an unadjudicated offense for felon in possession of a firearm.

Limon contends that his trial counsel was ineffective for failing to request a preliminary ruling on an alleged unadjudicated offense. He argues that the State could not prove beyond a reasonable doubt that Limon was a felon in possession of

a firearm in March 2019, and therefore, the trial court abused its discretion in putting the evidence before the jury.

To establish unlawful possession of a firearm by a felon, the State must show that the accused was previously convicted of a felony offense and possessed a firearm after the conviction and before the fifth anniversary of his release from confinement, or from community supervision, parole, or mandatory supervision, whichever date is later. TEX. PENAL CODE § 46.04(a)(1); *James v. State*, 264 S.W.3d 215, 218 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd). Possession is a voluntary act if the possessor knowingly obtains or receives the thing possessed or is aware of his control of the thing for a sufficient time to permit him to terminate his control. TEX. PENAL CODE § 6.01(b).

"If the firearm is not found on the defendant or is not in his exclusive possession, the evidence must affirmatively link him to the firearm." *James*, 264 S.W.3d at 219. The State may establish possession by proving an "affirmative link," which demonstrates that the defendant was conscious of his connection with the weapon and knew what it was. *Id.* Some factors that may establish an affirmative link include that the defendant was in close proximity and had ready access to the contraband; the defendant attempted to flee; and conduct by the defendant indicating consciousness of guilt. *Id.* The evidence used to satisfy these elements can be either direct or circumstantial. *Id.*

27

During the punishment phase, the State presented evidence that while out on bond for the underlying offense, Limon committed the offense of felon in possession of a weapon. A deputy from the Harris County Sheriff's Office testified that on March 13, 2019 he was dispatched to a call that a suspicious man in all black clothing, possibly holding a gun, was walking around pickup trucks in a driveway. When the deputy arrived, the reportee showed him surveillance video. In the video, the deputy saw a man in all-black clothing walking around two pickup trucks while looking in the windows and shaking the door handles. The man ran off when a security light in the driveway turned on.

The deputy relayed what he saw over the dispatch radio. Another patrol officer less than a mile away observed a person that matched the same description. The deputy went to that location and observed the same person he'd seen in the surveillance video, who he later identified as Alexis Limon.

The patrol officer also testified that he heard the deputy's radio call and observed a person that fit the description at a gas station nearby. The officer thought that the person was suspicious because he was in a Tahoe truck near an air pump but not adding air to his tires. Two other people were near the truck, about 30 feet away. The officer testified that the suspect was standing in a grassy area, and when the officer approached him, the person started to walk away. The officer noticed that the individual had tattoos on his face and an Astros star tattoo on his

28

neck. In the officer's experience, that meant that the individual was tied to the Houstone Tango Blast gang. After arresting the person, the officer located in the grassy area a pistol with an extended magazine containing several rounds. The officer identified the person he detained as Alexis Limon and arrested him for felon in possession of a firearm. The officer identified Limon in the courtroom.

There were sufficient circumstantial links to connect Limon as the felon in possession of the firearm during this incident. The jury heard testimony that a deputy responded to a call of a suspicious person walking around trucks, checking their windows and doors. The deputy testified that he went to a gas station nearby and identified the same person from the surveillance video at the gas station. Another officer testified that he responded to the gas station and saw a person standing near an air pump but not putting air in his tires. The person was standing in a grassy area. When the officer approached, the person began to walk away. After the officer arrested the person, he found a pistol in the grass. Though he did not see the man drop the gun, it was apparent that it had been freshly dropped in the grass.

The evidence was legally sufficient to prove that Limon was the person in possession of a firearm during this incident. Because the circumstantial evidence is sufficient to identify Limon, even if trial counsel had requested a preliminary hearing, the trial court would not have abused its discretion in admitting the

evidence. Trial counsel's performance did not fall below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 687–88; *see also Lopez*, 343 S.W.3d at 142.

### 3. Counsel was not ineffective for failing to seek a pretrial determination of the legality of Limon's arrest for public intoxication.

During the punishment hearing, the State presented evidence that while on bond in April 2021, Limon was arrested for public intoxication. Limon argues that trial counsel was deficient for failing to request a preliminary hearing regarding this incident because his initial detention was illegal, the search of his person was not justified by reasonable suspicion, and the evidence discovered as a result should have been suppressed. Limon argues that without the evidence, the State could not have proved that Limon possessed various controlled substances, and the trial court would have abused its discretion in admitting the evidence.

During the punishment phase, a police officer testified that he was dispatched in the early hours of the morning to an apartment complex regarding an intoxicated man who had broken a vehicle's window. Responding law enforcement split up to search for the suspect. The officer saw Limon run when Limon spotted another police officer. The officer chased and detained Limon. The officer observed that Limon had watery eyes, droopy eyelids, and slow, slurred speech. Limon appeared to be confused and had difficulty following directions and

30

answering the officer's questions. Though the officer determined that Limon was not the suspect from the call regarding the broken window, the officer believed that Limon was intoxicated and arrested him for public intoxication. The officer believed that Limon was a danger to himself due to his intoxication. Limon was searched and found in possession of ecstasy, cocaine, Adderall, and marijuana.

A police officer may arrest an individual without a warrant only if probable cause exists with respect to the individual in question, and the arrest falls within one of the exceptions set out in the Code of Criminal Procedure. *Torres v. State*, 182 S.W.3d 899, 901 (Tex. Crim. App. 2005). Article 14.01(b) of the Code of Criminal Procedure states that an officer may arrest an individual without a warrant for an offense committed within the officer's presence or view. TEX. CODE CRIM. PROC. art. 14.01(b). The ultimate question under article 14.01(b) is whether the officer's knowledge is sufficient "to warrant a prudent man in believing that the arrested person had committed or was committing an offense." *State v. Woodard*, 341 S.W.3d 404, 412 (Tex. Crim. App. 2011) (internal quotation omitted). A person commits public intoxication if he appears in a public place while intoxicated to the degree that he may endanger himself or another. TEX. PENAL CODE § 49.02(a). Public places include apartment buildings. *Id.* § 1.07(40).

Here, there was evidence that Limon was in a public place, he attempted to flee law enforcement, and he appeared intoxicated. The officer testified that

Limon's eyes were glassy, his speech was slowed, and he had trouble following commands. The officer also opined that Limon was a danger to himself. He was in an apartment complex parking lot in the early hours of the morning. *See State v. Martinez*, 569 S.W.3d 621, 629 (Tex. Crim. App. 2019) (stating intoxicated person was potential danger to himself in parking lot of public place "where it is reasonable to assume that cars would travel in and out"). Since the officer had probable cause to arrest Limon for public intoxication, trial counsel was not ineffective for failing to request a preliminary hearing on the legality of Limon's arrest. Limon has not established the first prong of the *Strickland* test that his counsel's performance was deficient. *Strickland*, 466 U.S. at 687–88.

### 4. Counsel was not ineffective for failing to attempt to exclude evidence of drugs found during the public intoxication arrest.

Limon further alleges that his counsel was ineffective for failing to attempt to exclude evidence of drugs found on Limon when he was arrested for public intoxication in April 2021. The officer who arrested Limon for public intoxication testified during punishment that he found cocaine, ecstasy, Adderall, and marijuana on Limon. Limon argues that his trial counsel should have objected to admission of testimony that he possessed Adderall, cocaine, and marijuana. He contends that only the ecstasy was tested by a forensic chemist, and therefore, the other

substances were not proven beyond a reasonable doubt.[2] The State responds that if appellant's counsel had objected, only the cocaine and Adderall would have been excluded because the ecstasy was tested, and marijuana can be visually identified by an officer. The State contends that trial counsel's decision did not fall below professional norms because it can be trial strategy to be transparent about criminal history and drug use during punishment. The State also alleges that Limon cannot demonstrate prejudice, as the admission of two of four substances would not have significantly changed his sentence.

The record is silent regarding counsel's reasons for not objecting to the drug testimony. Claims of ineffective assistance must be firmly rooted in the record. *Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999). When counsel has had no opportunity to explain his actions, we assume a strategic motive, if one can be ascertained, and find counsel deficient only if his conduct was so outrageous that no competent attorney would have engaged in it. *Hart v. State*, 667 S.W.3d 774, 782 (Tex. Crim. App. 2023). It is apparent from closing argument that defense counsel's overall strategy was to portray Limon as a person who had experienced a "downward spiral" from using drugs from a young age. It is conceivable that trial counsel did not object to the officer's testimony regarding the drugs found on

---

[2] Limon also argues that all the drug evidence should have been excluded because his arrest was not supported by probable cause. Having held that the officer had probable cause to arrest Limon for public intoxication, we do not address his argument based on the exclusionary rule. *See* TEX. R. APP. P. 47.1.

Limon during the arrest because he wanted to be upfront and honest about Limon's past. It is also conceivable that counsel believed drawing attention to the testimony by objecting, when only two of the substances could have possibly been excluded, was not a worthwhile strategy for garnering leniency with the jury as it could appear as though Limon did not take responsibility for his drug use. On this record, we cannot say that no reasonable trial strategy justified counsel's actions. *See Menefield*, 363 S.W.3d at 593.

5. **Counsel was not ineffective for failing to make a Confrontation Clause objection to identification testimony regarding alleged aggravated assault with a deadly weapon.**

Limon next contends that his counsel was ineffective for failing to object based on the Confrontation Clause to identification testimony from an unavailable witness regarding an unadjudicated extraneous conduct that occurred in September 2021. The State alleged that Limon had committed aggravated assault with a deadly weapon while in Harris County Jail in September 2021. The State responds that the trial record is not sufficiently developed to firmly establish that counsel was ineffective.

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The admission of a hearsay statement made by a non-testifying declarant violates the Sixth Amendment if the statement was testimonial,

and the defendant lacked a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). Testimonial statements are "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 51–52.

During the punishment phase, the State offered evidence that Limon committed assault with a deadly weapon while in jail in September 2021. A Harris County investigator testified that she watched surveillance video from the time of the assault on two inmates. She described the video, and it was shown to the jury. The video showed towels, sheets, and blankets propped up to block the camera's view. The investigator testified that inmates typically block the camera in this way when inmates are having a fight, having sexual relations, playing dice, or gambling.

In the video, several inmates go into one cell. Their feet are visible moving around while a broomstick is being tossed. The blankets flare as they were causing the assault. People's hands with closed fists can be seen as the second complainant is pulled down from a top bunk. The first complainant is seen side punched. When the lights turn on in the cell block, all the inmates run out except for the complainant. The investigator testified that she looked at a roster of who was in which cell block at that date and time. She then pulled their photos from processing

35

into the jail. As she watched the video of the inmates leaving the cell block, she used a snipping tool to take a picture and compared that picture to the intake photos for the cell block. She believed she had positively identified six inmates who were part of the assault. One of the individuals the investigator identified was Limon. The investigator created a photo array that was shown to one complainant. The investigator testified, "that's how we positively Id'd the complain–, the suspects or the defendants." Defense counsel objected based on hearsay, and the objection was overruled. The investigator testified that she later interviewed Limon and charged him, and four other people, with aggravated assault with a deadly weapon.

The record reflects that the substance of the victim's identification was not relayed to the jury. During her testimony, the investigating officer said that she had administered a photographic array to the complainant, and that was how she identified "the defendants." The investigating officer did not testify that the victim had specifically identified Limon.

Even if the statement about which Limon complains was testimonial, we cannot say his counsel was ineffective for falling to object based on the Confrontation Clause. Whether the Confrontation Clause applies during a punishment hearing before a jury in Texas is an open question. *See Stringer v. State*, 309 S.W.3d 42, 45–48 (Tex. Crim. App. 2010) (holding that when a pre-

sentence investigation report is used in non-capital case when judge determines sentencing, *Crawford* does not apply and declining to address whether *Crawford* applies when jury determines sentencing). Claims of ineffectiveness must be firmly rooted in the record. *Thompson*, 9 S.W.3d at 814. "Because the law is not an exact science and it may shift over time, the rule that an attorney is not liable for an error in judgment on an unsettled proposition of law is universally recognized." *Ex parte Chandler*, 182 S.W.3d 350, 358 (Tex. Crim. App. 2005) (internal quotation omitted). We cannot say that counsel's failure to object based on the Confrontation Clause fell below objective standards of professional norms. *See Lopez*, 343 S.W.3d at 142.

We overrule Limon's ineffective assistance of counsel issue.

## Conclusion

We affirm the judgment of the trial court.


Peter Kelly
Justice

Panel consists of Justices Kelly, Hightower, and Countiss.

Do not publish. TEX. R. APP. P. 47.2(b).

37